UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SISTERS OF ST. FRANCIS HEALTH SERVICES, INC., d/b/a ST. FRANCIS HOSPITAL MOORESVILLE, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:05-cv-0623-DFH-TAB |
| v. | ) | |
| | ) | |
| MORGAN COUNTY, INDIANA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the past, the State of Indiana required state government approval, in the form of what was often called a certificate of need, before a new hospital could be built or an existing hospital could be substantially expanded.  The state repealed that requirement in 1987 and allowed market forces of supply and demand to replace the certificate of need regulatory process.  Pub. L. No. 194-1987, § 9, 1987 Ind. Acts 2270 (repealing Ind. Code §§ 16-1-3.7-1 to -12).

The central issue in this case is whether a county government in Indiana may now impose on its own a new requirement for county approval of hospital construction or expansion.  Under a federal statute protecting religious freedom, a more specific question is whether such a county requirement may be applied to a hospital operated by a religious order in furtherance of its mission to heal the

sick.  The case was tried to the court on October 4 and 5, 2005 on an expedited schedule with the agreement of the parties.  The court now states its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  Substance rather than the court's label shall govern whether a matter is treated as a finding of fact or a conclusion of law.  As explained below, the court finds that the new Morgan County ordinance imposing first a limited moratorium and then a county approval requirement on hospital construction in the county is preempted by Indiana's Home Rule Act.  The court also finds that the ordinance is not preempted by the federal Sherman Act, does not at least on its face violate plaintiff's rights under the federal Religious Land Use and Institutionalized Persons Act known as RLUIPA, and does not violate Indiana zoning laws.[1]

### Findings of Fact

The parties in this case operate the only two hospitals in Morgan County, Indiana.  Plaintiff Sisters of St. Francis Health Services, Inc. ("St. Francis") operates a hospital in Mooresville.  It has brought this action against defendants Morgan County, the county's Board of Commissioners, and the Board of Trustees of Morgan Hospital & Medical Center ("Morgan Hospital"), which operates a

---

[1]Shortly before trial, defendants gave notice of their intent to challenge the constitutionality of RLUIPA, and the court gave the notice to the United States required by 28 U.S.C. § 2403(a).  On October 28, 2005, the United States moved to intervene but stated it did not intend to file a brief unless the court indicated a desire to have a brief on the constitutional issue.  The court has granted the motion to intervene so that the United States can participate in the case.  Because the court rejects plaintiff's RLUIPA claim on the merits, the court has not reached the constitutional issue and has not requested additional briefing on it.

hospital in Martinsville.  On April 18, 2005, the Commissioners passed Ordinance 4-1-6, titled the "Morgan County Ordinance for Health Facilities Planning and an Equitable Assessment for Uninsured Care" ("the Ordinance").  The Ordinance imposes a limited moratorium on the construction of specified health care equipment and facilities within the county until December 31, 2005.  After that date, the Ordinance requires the Commissioners to approve construction of such facilities.  The Ordinance took effect immediately upon passage.

When the Ordinance took effect, St. Francis was planning a $40 million expansion project of its hospital in Mooresville.  The project has been stalled by passage of the Ordinance with its two-stages of regulation:  first the 2005 moratorium, and then the more permanent approval process taking effect on January 1, 2006.  The Ordinance provides an exception to the moratorium for applicants who could "demonstrate sufficient need" according to criteria discussed below.  St. Francis has not submitted an application for an exception but instead filed this suit.  St. Francis alleges that the Ordinance violates the Sherman Antitrust Act, 15 U.S.C. § 1, the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, the Indiana Home Rule Act, Indiana Code § 36-1-3-1 *et seq.*, and Indiana zoning laws.

Morgan Hospital and St. Francis compete with one another in the delivery of health care services in Morgan County, Indiana.  Morgan Hospital is an agency of the Morgan County government.  Jt. Ex. 1 at 1; Ex. 9.  Morgan Hospital was

-3-

created by the Board of Commissioners of Morgan County, Indiana. Jt. Stip. Fact
¶ 7. Morgan Hospital is operated by its own Board of Trustees, the members of
which are appointed by the Board of Commissioners. *Id.*, ¶¶ 8 & 9. The
Commissioners guaranteed a loan issued in 2002 to finance a multi-million dollar
expansion of Morgan Hospital. Ex. 265. Morgan Hospital provides inpatient,
outpatient, and emergency room services. It also provides a range of related
health care services that include cancer treatment, orthopedic services, kidney
dialysis, cardiac catheterization, emergency room, and laboratory services. *Id.*,
¶¶ 13-16.

Plaintiff Sisters of St. Francis Health Services, Inc. ("St. Francis") is a not-
for-profit corporation sponsored and controlled by the Sisters of St. Francis of
Perpetual Adoration, a religious congregation of women in the Roman Catholic
Church. Jt. Stip. Facts ¶¶ 2 & 3. St. Francis's Hospital-Mooresville is one of
three hospital campuses that St. Francis operates in south-central Indiana. *Id.*,
¶ 27. St. Francis does not require its employees to subscribe to the Catholic faith,
but it requires that all employees perform their jobs in accordance with the
"Ethical and Religious Directives for Catholic Health Care Services." Jt. Ex. 53;
Jt. Ex. 67. Employees must also be willing to abide by the mission and values of
the Sisters of St. Francis of Perpetual Adoration. Sister Jane Marie Klein,
Chairperson for the Board of St. Francis, testified that an important aim of St.
Francis Hospital – Mooresville is to carry out what the sponsoring Sisters of St.
Francis believe to be their healing ministry.

The Ordinance had its origins in the fall of 2004 when Morgan Hospital officials presented to the County Commissioners a version of the Ordinance that would have imposed a two year moratorium on health care facility construction in the county.  Jt. Stip. Fact ¶¶ 18, 19.  Tom Laux, CEO of Morgan Hospital, provided the original draft to Pete Foley, counsel for Morgan County.  P. Foley Dep. at 16-17.  Morgan Hospital representatives publicly presented the early draft of the Ordinance at a meeting of the Board of Commissioners on November 15, 2004. Jt. Stip. Fact ¶ 19; Jt. Ex. 4.  Keith Jewell, Executive Director of St. Francis Hospital – Mooresville, spoke against enactment of a moratorium at the meeting. Jt. Ex. 8 at 23-40.  After public comment, the Commissioners decided to table the proposal.  Jt. Stip. Fact ¶ 19: Jt. Ex. 8 at 55.

In January 2005, Ralph Foley, counsel for Morgan Hospital, wrote to Steven Harris, counsel for St. Francis, addressing the issue of the proposed moratorium. Foley described Morgan Hospital as "a unit of county government" and expressed Morgan Hospital's interest in collaborating with St. Francis to solve the parties' disagreement over enactment of a moratorium.  Foley wrote:  "For example, we could have a limited moratorium that would benefit both St. Francis and Morgan Hospital, should St. Francis not further duplicate Morgan [Hospital]'s services." Jt. Ex. 9.  Writing back on behalf of St. Francis, Harris declined, explaining that since the two hospitals could be considered competitors, such agreements could violate antitrust laws.  Jt. Ex. 10.

Attorney Ralph Foley is also a member of the Indiana House of Representatives.  During the 2005 session of the General Assembly, he introduced House Bill 1494, which would have permitted a county executive to adopt an ordinance requiring health care facilities to obtain county approval before building a new health care facility.  Jt. Ex. 11; Jt. Stip of Fact ¶ 37.  The bill was amended and approved by the House Committee on Public Health but died without a vote by the full House of Representatives.  Jt. Stip. Fact ¶ 38.

After House Bill 1494 died, Morgan Hospital's effort to prevent St. Francis – Mooresville from expanding then returned to the County Commissioners.  At a public meeting on April 18, 2005, the Commissioners again addressed the proposed moratorium.  *Id.* ¶ 17; Jt. Ex. 17.  Because the Foley, Foley & Peden law firm represented both Morgan Hospital and Morgan County, the meeting's discussion on the moratorium began with a conflict waiver by the Commissioners. Jt. Ex. 17 at 1-2.  Representatives from both Morgan Hospital and St. Francis made presentations at the meeting.  See Jt. Ex. 17.  In his presentation on behalf of Morgan Hospital, Ralph Foley noted that Morgan Hospital is a branch of the county government, *id.* at 17, and he spoke specifically about St. Francis in advocating passage of the Ordinance:

> [The Ordinance] has exceptions for the existing private specialty hospital. And Morgan Hospital would continue to accept St. Francis because they do fine work.  But it keeps duplicating a lot of the same services that Morgan [Hospital] has as a full service hospital.

*Id.* at 13-14.  Foley acknowledged the antitrust implications of direct collaboration between Morgan Hospital and St. Francis:

> There is a problem in collaboration.  I was asked why don't you work these things out together?  Why don't you get together? I think they are correct when they inform me that we cannot collude or violate antitrust laws, but we can all come before the County as a result of an ordinance and make our case clear as to our medical facilities.

*Id.* at 14.  Representatives of St. Francis spoke in opposition to the Ordinance. *Id.* at 30-49.  The Commissioners voted to amend the draft in several respects and then passed the Ordinance unanimously, to take effect immediately.  Jt. Ex. 17 at 66-76.  The Board of Commissioners, elected by the residents of Morgan County, is responsible for enforcing the Ordinance.  Jt. Stip. Fact ¶¶ 20 & 21.

On October 3, 2005, one day before trial, the Commissioners voted to amend the Ordinance further.  The court addresses the Ordinance as it exists now, noting the effects of amendments as needed.

The Ordinance begins with several "Whereas" paragraphs that explain its purpose.  These provisions emphasize Morgan County's interest in Morgan Hospital:

> WHEREAS, the Board of Commissioners of Morgan County . . . are charged with the responsibility for the viability of [Morgan Hospital] as a County agency offering [a] full service hospital and medical services to all citizens of Morgan County regardless of their ability to pay; and
>
> WHEREAS, the County of Morgan is bound by its endorsement of bonds or other debt of [Morgan Hospital] in its quest to provide for complete and

progressive medical care and services to all citizens of Morgan County regardless of their ability to pay; and

\* \* \*

WHEREAS, the continued viability and financial performance of [Morgan Hospital] is of paramount importance to all citizens, and all parties desire that [Morgan Hospital] continue to be viable without the requirement of taxpayer subsidy. . . .

Jt. Ex. 1 at 1.  The Ordinance asserts that Morgan Hospital "is significantly disadvantaged" for two reasons:  (1) its "provision of a disproportionate share of the County's responsibility to ensure healthcare to all its citizens regardless of their ability to pay," and (2) its limited access to capital that could be used to support expansion.  *Id.*  The Ordinance asserts that private capital investments in health facilities that duplicate those offered by public facilities may be both unnecessary and harmful to public facilities.  *Id.*  The Ordinance also states the Commissioners' intent to "effect health policy that provides appropriate access to health care for all citizens of Morgan County while not creating disproportionate financial burdens" on Morgan Hospital.  *Id.*  These opening paragraphs also evidence the Commissioners' intent to initiate studies of the health care environment in Morgan County.  *Id.*

Section 2 of the Ordinance declares "a moratorium on the construction of new Covered Healthcare Equipment and Facilities" in Morgan County.  Entities specifically covered by the Ordinance include "hospital emergency rooms and acute inpatient services," "hospital outpatient services," "a cancer treatment facility," "a cardiac catheterization facility," a "specialty hospital," or any "facility

that duplicates a service provided by Morgan Hospital and Medical Center," among

others.  Jt. Ex. 1 at 2.  Section 3 provides several exceptions, both by category and

by creation of a procedure for seeking a specific exception:

> This ordinance shall not apply to:
>
> * * *
>
> (b)  The replacement or repair of a building or equipment due to an earthquake or severe adverse weather conditions or due to normal wear and tear.
>
> (c)  A County governmental health care program.  As used in this Ordinance "County governmental health care program" means a program that provides health care facilities, equipment, or other benefits that is owned or operated by the Morgan County Public Health Department or the Morgan County Emergency Management Agency.
>
> * * *
>
> (e)  A new health service constructed by an existing hospital facility located in Morgan County that will not duplicate an existing health service available in the County.
>
> * * *
>
> (g)  An applicant may petition the Commissioners for an exception to this moratorium if the applicant can demonstrate sufficient need for the program or facility according to the criteria in Section 7(f) of this Ordinance.

Jt. Ex. 1 at 3; Jt. Ex. 268.[2]

---

[2]As originally passed on April 18, 2005 (Ordinance No. 4-1-6), Section 3(e) gave even more explicit protection to Morgan Hospital, stating that the Ordinance would not apply to:  "A new health service constructed by an existing hospital facility located in Morgan County that will not duplicate a health service available at the County-owned hospital . . . or other County governmental health program." Jt. Ex. 1 at 3.

Section 7 provides that after the expiration of the moratorium on December 31, 2005, new covered health care facilities may not be built in Morgan County without the approval of the Commissioners.  Jt. Ex. 1 at 4.  Section 7 defines a "health care facility" as including a hospital licensed under Indiana law, an ambulatory outpatient surgical center, any other facility providing health care services that is licensed by the Indiana Department of Health, and any health care facility that exceeds either "two hundred thousand ($200,000) in planned construction costs" or "one thousand five hundred (1,500) square feet."  *Id.* at 5.

Section 7(f) provides factors to be considered in deciding whether to approve an application for a new health care facility.  These are also the factors relevant to a request for an exception to the 2005 moratorium under Section 3(g):

1. The impact of the new health care facility on the county residents' ability to access new and high quality health care services.

2. The current availability of alternative, less costly, or more effective means to satisfy the goals of the new health care facility.

3. The immediate and long term financial feasibility of the new health care facility.

4. The impact of the new health care facility on health care costs and the charges for other health care facilities in the county.

5. The fiscal impact on other health care facilities in the county.

6. The availability of resources for the new health care facility, including management and personnel.

7. The new health care facility's economic impact on the county, including the creation of new jobs.

8.      The capacity of health care facilities located in the county to improve the quality of health care services and to respond to customer preferences.

9.      The effect of competition on the efficient use of health care resources and providing quality health care.

10.     The contribution of the new health care facility in serving the county's medically underserved population, including low income persons, minorities, the disabled, and the elderly.

*Id.* at 5-6.  The Ordinance purports to exempt the Commissioners' approval or disapproval of an application from judicial review, save only for non-compliance with the terms of the Ordinance itself.  Section 8 of the Ordinance provides a severability clause stating that in the event that any portion of the Ordinance is found invalid, any remaining provisions that may be given effect would remain unaffected by or would be severed from the invalid provisions.

Section 4, entitled "Penalties," provides that Morgan County may enforce the Ordinance by injunction in a Morgan County court against anyone who applies for licensure to a governmental agency of jurisdiction in violation of the Ordinance.  *Id.* at 3.  As originally passed, the Ordinance posed an obvious problem under Indiana's Home Rule Act because it purported to prohibit those subject to the Ordinance from applying to state government agencies for any needed approvals or licenses without the county's permission.  The amendment on the eve of trial amended Section 4(b) of the Ordinance to allow an applicant to pursue state licensure or other governmental approvals while the county process moves forward.  Jt. Ex. 268.  The penalty section also provides for a civil penalty

against those who violate the Ordinance, Jt. Ex. 1 at 3-4, though the Commissioners' testimony at trial indicates that they have not developed a civil fee schedule.

Beyond what is provided in the amended Ordinance about the application procedure under Sections 7(f) or 3(g), Morgan County has developed no additional written definitions, forms, procedures or guidelines for the approval process. Commissioner Voyles testified that the Commissioners might take into account factors not listed in Section 7(f) in assessing an application under the Ordinance. Voyles also testified that he believed himself not to be qualified to evaluate information submitted in an application under at least the first factor in Section 7(f), but that the Commissioners were likely to hire a consultant to help with the process. The Commissioners have not made any plans for hiring such a consultant and have not sought bids for such a service. Commissioner Voyles testified that he was unable to estimate how long the application process might take. Commissioner Quyle testified that he was aware of organizations or individuals that might provide such a consulting service.

St. Francis has incurred costs and entered into an agreement for completion of architectural and construction plans for the renovation and expansion of its hospital services at the St. Francis – Mooresville Hospital. Jt. Stip. Fact ¶ 22. Jewell testified that in 2003 and 2004, St. Francis hired consultants to evaluate both the need for and financial implications of its plans for expansion. Jt. Exs.

74, 104, 215.  This information shaped St. Francis's plan for its expansion project. St. Francis considers the information presented by its consultants, as well as project descriptions or related documents, to be confidential, competitively sensitive information, and it reveals such information only as necessary.   To prevent competitors from using such information, St. Francis prefers not to reveal information for expansion projects until shortly before construction.

St. Francis's board of directors previously approved spending $2.1 million for architectural drawings and site preparation for the planned expansion.  In March 2005, St. Francis signed a contract with an architectural firm to begin the plans.  Jt. Ex. 105.  In September 2005, St. Francis's board approved the 2005 expansion project, which was an extension of the 2004 expansion project.  The entire area upon which St. Francis plans to build lies within the town of Mooresville, a fact that is relevant to Indiana zoning laws.

As a result of the Ordinance, St. Francis altered its expansion plans.  The changes have hindered the expansion by affecting preparations for construction and staff recruitment.  Robert Brody, CEO of the Central Indiana Region of St. Francis, testified that the Ordinance has "cast a shroud of doubt" over the expansion because the expansion hinges on the approval of the County, which complicates the planning process.

St. Francis has not applied for an exception to the 2005 moratorium under Section 3(g) of the Ordinance, nor has St. Francis applied for Board approval of its expansion plans under Section 7(f).  St. Francis has not yet taken steps to inquire about the application process for an exception.  St. Francis admits that some of its plans for the expansion project would not require an approval from the Commissioners, but it claims that the expansion is a unified plan, so that St. Francis will not undertake any part of the expansion if it is not permitted to build the entire project.

In making its internal decision to go forward, St. Francis undertook a careful review of the need for and appropriateness of the planned expansion.  See Jt. Ex. 73.  Some of the information that it used to perform this evaluation is available publicly, such as from the Indiana State Hospital Association.   St. Francis, through its own investigations and other information available to it, already possessed information relevant to the factors listed in Section 7(f) for evaluating the need for new hospital facilities in Morgan County.

*Conclusions of Law*

I.   *Jurisdiction and Procedural Matters*

This court has original jurisdiction of St. Francis's federal claims under 28 U.S.C. §§ 1331, 1337(a), and 1343(a)(4), and supplemental jurisdiction over St. Francis's state law claims under 28 U.S.C. § 1367.  In response to the complaint,

defendant Morgan Hospital filed a motion to dismiss St. Francis's claims against it under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  All defendants filed a joint Rule 12(b)(1) motion to dismiss St. Francis's RLUIPA claim as not ripe and a Rule 12(b)(6) motion to dismiss St. Francis's Sherman Act claim.

As discussed below, the court has found based on the evidence at trial that the RLUIPA claim is ripe as a facial challenge to the Ordinance.  The court did not reach a firm conclusion as to whether the Sherman Act claim was suitable for dismissal on the pleadings under Rule 12(b)(6).  Because the case presents questions of significant public interest and urgency affecting the delivery of hospital-based health care in Morgan County, the court chose not to delay the expedited trial while the motions to dismiss were under consideration.  Even if the court had granted a motion to dismiss, St. Francis would have been entitled to an opportunity to file an amended complaint, resulting in further delay.  See *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) (reversing dismissal and denial of leave to amend: "The better practice is to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the court will be able to determine conclusively on the face of a defective pleading whether plaintiff actually can state a claim."), citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990).  The motions to dismiss are hereby deemed denied.

II.    *The Sherman Act*

Section 1 of the Sherman Act states:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1. A horizontal agreement between competitors to allocate the market is a *per se* violation of Section 1.  *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972).  St. Francis contends that the Ordinance is preempted by Section 1 of the Sherman Act on the theory that the Ordinance compels St. Francis to enter into a horizontal conspiracy to allocate the market for health care in Morgan County.[3]

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982), states the test for determining whether a state law is preempted by the Sherman Act:

> Our decisions in this area instruct us, therefore that a state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.  Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a *per se* violation.

458 U.S. at 661.  The same test applies to the acts of a local government like Morgan County.  *Fisher v. City of Berkeley*, 475 U.S. 260, 265 (1985).

---

[3]This case contains no trace of a joint venture between St. Francis and Morgan Hospital that might serve to remove a market allocation from the *per se* rule of *Topco*.  See generally *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 225-30 (D.C. Cir. 1986).

A.    *Direct Competition*

The central question is whether the Ordinance compels a conspiracy to allocate the market for hospital health services in Morgan County.  The evidence shows that St. Francis and the defendants should be deemed direct competitors for hospital-based health care services in Morgan County.   St. Francis – Mooresville and Morgan Hospital are direct competitors.   The Board of Commissioners and Morgan Hospital agree that their relationship gives them the kind of "complete unity of interest" that prevents them from being viewed as separate entities conspiring between themselves under Sherman Act § 1.   See *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).  At the same time, these defendants argue they should not be considered a single entity that competes directly with St. Francis – Mooresville.  This position is undermined by its internal inconsistency.

Morgan Hospital is an agency of the county.  Jt. Ex. 1 at 1.  Morgan Hospital was created by an act of the Board of Commissioners.  Jt. Stip. of Fact ¶ 7.  Though Morgan Hospital is governed by its own Board of Trustees, the Trustees are appointed by the Commissioners.  *Id.* ¶¶ 8 & 9.  The Commissioners are responsible for the viability of Morgan Hospital.  Jt. Ex. 1 at 1.  To this end, the Commissioners may bind the county to guarantee payment of Morgan Hospital's debts, as they did in 2002.  *Id.*; Jt. Ex. 265.  Under Indiana law, Morgan County must exercise its eminent domain power to acquire real property for hospital purposes at Morgan Hospital's request.  Jt. Stip. of Fact ¶ 11; Ind. Code

§ 16-22-3-25.  Morgan County may provide financial support to Morgan Hospital through either appropriations from the county's general fund or a tax levy.  Jt. Stip. of Fact ¶ 10; Ind. Code § 16-22-3-27(a).  As a result, Morgan County has a significant interest in maintaining the economic viability and independence of Morgan Hospital.  See Jt. Ex. 1 at 1 ("the continued viability and financial performance of [Morgan Hospital] is of paramount importance to all citizens, and all parties desire that [Morgan Hospital] continue to be viable without the requirement of taxpayer subsidy").  In fact, the county and Morgan Hospital were so closely allied that during depositions in this case, the defendants asserted they were a "joint enterprise" such that communications between them through their attorneys (who are partners in the same firm) were protected by the attorney-client privilege.

The evidence demonstrates that defendants have a unity of interest that warrants their treatment as a single entity for the purposes of St. Francis's Sherman Act claim.[4]  Because Morgan Hospital and St. Francis are direct

_____

[4]Morgan Hospital's Rule 12(b)(6) motion argued that St. Francis does not actually seek coercive relief against Morgan Hospital.  The motion also argued that Morgan Hospital's involvement in proposing and supporting enactment of the Ordinance is protected by the *Noerr-Pennington* doctrine.  See *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669-70 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 134-140 (1961).  The court is not granting any coercive relief against Morgan Hospital.  However, given the evidence of Morgan Hospital's involvement in the drafting and enactment of the Ordinance, as well as the clear interest it has in the Ordinance's enforcement, it was reasonable for St. Francis to name Morgan Hospital as a defendant.  Morgan Hospital has an interest relating to the subject of this action, and at least some possible outcomes of this case could impair Morgan Hospital's
(continued...)

competitors, it is appropriate to treat Morgan County itself as a direct competitor of St. Francis.

B.    *State Action Immunity*

In *Parker v. Brown*, 317 U.S. 341, 350-51 (1943), the Supreme Court held that because the Sherman Act was not intended to restrain state action, principles of federalism barred application of the Act to state actions that would otherwise violate the Act.  Because local governments are not sovereigns, they do not enjoy the same autonomy under the *Parker* doctrine.  *City of Lafayette v. Louisiana Power and Light Co.*, 435 U.S. 389, 411-12 (1978) (plurality opinion).  The anti-competitive act of a local government is exempt from the reach of the Sherman Act by the state action doctrine only where the government is acting in accord with a clearly articulated state policy to "displace competition with regulation or monopoly public service."  *Id.* at 413 (plurality opinion); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 40 (1985); *Fuchs v. Rural Electric Convenience Co-Op. Inc.*, 858 F.2d 1210, 1214 (7th Cir. 1988).

To establish such a clearly articulated policy to displace competition, the state need not compel the anti-competitive conduct; nor must the state explicitly

---

[4](...continued)
ability to protect that interest.  See Fed. R. Civ. P. 19(a)(2); *Dickinson v. Indiana State Election Board*, 933 F.2d 497, 500-02 (7th Cir. 1991) (ordering district court to determine liability first on claims based on legislative districting and then, if liability were found, to consider possible joinder of additional defendant under Rule 19 to determine and implement injunctive remedy).

say that it expects or allows a local government to engage in such conduct. *City of Eau Claire*, 471 U.S. at 42; *Fuchs*, 858 F.2d at 1214. A state may deemed to have adopted a clearly articulated policy to replace competition with regulation where the anti-competitive conduct of a local government is a foreseeable result of a state's grant of power to it. *City of Eau Claire*, 471 U.S. at 42; *Fuchs*, 858 F.2d at 1214. It is well established, though, that a general grant of "home rule" power to govern local affairs is not sufficient to demonstrate a state policy to replace competition. *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 55 (1982) (rejecting claim that home rule legislation was sufficient to authorize local ordinance restricting competition in cable television service).

*City of Eau Claire* illustrates the type of clear expression needed. Several Wisconsin towns sued the City of Eau Claire under the Sherman Act for using its monopoly over sewage treatment to gain a monopoly over both sewage collection and transportation. The city's sewage treatment facility was the only one of its kind in the market available to the towns. Instead of providing sewage treatment to the towns, the city provided treatment only to individual landowners in areas within the towns if a majority of the individuals in such areas voted to have their homes annexed by the city and to use the city's sewage treatment and transportation services. 471 U.S. at 36-37. The Supreme Court found that the state of Wisconsin had provided the clearly articulated policy warranting exemption of the city's actions by the state action doctrine based on: (1) a state statute granting the city the power to "construct, add to, alter, and repair sewage

systems" and to describe its area of service; (2) a state statute allowing a city operating a public utility to define the limits of its service in unincorporated areas and relieving the city of any obligation to provide services outside the defined area; and (3) a state statute permitting the state's Department of Natural Resources to require that a city's sewage system be accessible for use by nearby towns, but provided that such an order would be void if such a territory refused to be annexed to the city. *Id.* at 41. The Court found that the state contemplated the anti-competitive effects of the city's actions, which were a foreseeable result of the powers it granted to the city, so that the state action doctrine protected the city from Sherman Act liability. *Id.* at 42.

The issue here is whether Indiana has expressed a similarly "clearly articulated policy to replace competition" in providing hospital-based health care services by granting Morgan County any power that would foreseeably result in anti-competitive conduct. Defendants argue that the power to restrain competition among health care providers is found in the following statute:

> A [county] may provide medical care or other health and community services to persons and may impose restrictions upon persons or animals that might cause other persons or animals to be injured or contract diseases. A [county] may also establish, aid, maintain, and operate hospitals.

Ind. Code § 36-8-2-5. Defendants hang their state action immunity argument on the verb "aid" in the statute. By providing Indiana counties with the ability to "aid" county-owned hospitals, defendants argue, Indiana must have contemplated

that counties would engage in conduct that restrains competition in hospital and other health care services.  Def. Tr. Br. at 22.

For two reasons, Indiana's grant of authority to "aid" a county hospital falls well short of the clear articulation shown by the Wisconsin policy reflected in the state's grant of authority to define the area of a city's sewage treatment service in *City of Eau Claire*.  First, the state statutes in *City of Eau Claire* spoke directly to the conduct and effects at issue by specifically allowing the city to define its service area and by allowing the city to bar access to city sewage facilities if an area refused to be annexed.  The word "aid" alone is far too general to show such approval in the present case.

Second, Indiana has expressly adopted a state policy in favor of competition in delivery of health care services.  No comparable state policy was present in *City of Eau Claire*.  The Indiana Code provision delegating the responsibility for health planning and resources development to the State Department of Health requires that in doing so, the agency must "foster competition."  Ind. Code § 16-30-1-1. State law also provides:

> The state department shall consider the following factors in assessing the health needs of the citizens and communities of Indiana:
> * * *
> (6)  The competitive factors of the free enterprise system, with the goal of encouraging competition and efficiency in the utilization of health resources.

Ind. Code § 16-30-2-2(6).  Morgan County's argument that the general power to "aid" a county hospital demonstrates a policy allowing counties to restrain health care competition cannot be reconciled with Indiana's clearly articulated policy in favor of competition in health care markets.  Because Indiana has clearly stated a preference for competition in health care, Morgan County's actions to protect Morgan Hospital from competition are not the foreseeable result of the grant of power to "aid" a county hospital.  Morgan County's Ordinance is not protected by the state action doctrine.

> C.     *Contract, Combination, or Conspiracy*

There can be no liability under Section 1 of the Sherman Act in the absence of a conspiracy, agreement, or other concerted action by separate entities to restrain trade.   15 U.S.C. § 1; *Fisher v. City of Berkeley*, 475 U.S. at 266-67; *Copperweld*, 467 U.S. at 768.  St. Francis has failed to prove the kind of concerted action required for a Section 1 violation.

St. Francis does not argue that Morgan Hospital and Morgan County engaged in a conspiracy with each other in violation of Section 1.  Rather, St. Francis argues that its own compliance with the Ordinance would establish the required joint action among competitors.  Under this argument, requiring St. Francis to comply with the Ordinance by seeking the approval of its competitor – Morgan County itself – for its expansion amounts to an agreement to allocate the market in violation of Section 1.  Pl. Tr. Br. at 9.

The facts of the present case are analogous to those presented in *Fisher v. City of Berkeley*, in which a group of landlords alleged that Berkeley's enactment of a rent control ordinance compelled a conspiracy to fix prices. 475 U.S. at 263, 264. In *Fisher*, the Supreme Court made clear that enactment of and compliance with a local ordinance, even if the effect is to restrain trade, does not amount to a conspiracy for Sherman Act purposes. Acknowledging that the same agreement on rental price ceilings would have been a *per se* violation of the law if it had been undertaken by private parties, the Court explained:

> A restraint imposed unilaterally by government does not become concerted-action within the meaning of [Section 1 of the Sherman Act] simply because it has a coercive effect upon the parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy. . . . There is no meeting of the minds here. The owners of residential property in Berkeley have no more freedom to resist the city's rent controls than they do to violate any other local ordinance enforced by substantial sanctions.

*Id.* at 267 (citations omitted).

Under the reasoning of *Fisher*, any application for approval of hospital expansion by Morgan County would amount to no more than obedience to the regulatory commands of a local government. See also *Massachusetts Food Ass'n v. Massachusetts Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 564-66 (1st Cir. 1999) (holding that a state statute limiting the number of liquor store licenses per owner to three amounted not to a conspiracy but was unilateral governmental action); *Englert v. City of McKeesport*, 872 F.2d 1144, 1150 (3d Cir.

1989) ("It is well settled, however, that a restraint established through unilateral action by the government is not transformed into concerted action merely because the government enforces it."). Without the requisite "meeting of the minds" no conspiracy can be demonstrated. *Fisher*, 475 U.S. at 267.[5]

St. Francis seeks to distinguish this case from *Fisher* by arguing that because Morgan County and its Board of Commissioners share a unity of interest with Morgan Hospital, the county has acted not as a government but as a market participant in direct competition with private hospitals like St. Francis. Because of this position as a direct competitor, St. Francis argues, Morgan County should not be deemed to have the kind of "ordinary relationship" between government and the governed that existed between the City of Berkeley and the plaintiff landlords in *Fishe*r. Essentially, St. Francis urges the court to find what amounts to a market participant exception to *Fisher*'s unilateral action rule.

This effort to distinguish *Fisher* is not persuasive for two reasons. First, the facts here are simply not distinguishable from those in *Fisher*. The Berkeley

---

[5]St. Francis also has not tried to show that the Ordinance places governmental regulatory decisions in the hands of private actors, the kind of "hybrid" restraint that has typically been excepted from the *Fisher* unilateral action rule. See *Fisher*, 475 U.S. at 268 ("Where private actors are thus granted 'a degree of private regulatory power,' the regulatory scheme may be attacked under § 1.")(citations omitted). The Ordinance does not require approval of competing hospitals or any other private actor for expansion. Just as Berkeley placed decisions on variances from rent control ceilings in the city's Rent Stabilization Board in *Fisher*, 475 U.S. at 269, Morgan County's Ordinance places decisions on hospital expansion in the County Commissioners.

ordinance in *Fisher* had an exception from its rent control ceiling for any "government-owned units," presumably including its own. See *id.* at 262, 270 n.2. The clear implication is that Berkeley was just as much a market participant or direct competitor to the plaintiff landlords as Morgan County is to St. Francis in this case. Second, St. Francis has not offered any controlling or persuasive authority supporting a market participant exception to *Fisher*. The Supreme Court has entertained the idea of a market participant exception to the state action doctrine, but has not adopted the exception. See *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379 (1991) (stating that "with the possible market participant exception, *any* action that qualifies as state action is '*ipso facto* . . . exempt from antitrust laws.'") (citation omitted).

The Supreme Court has recognized that the aims of local governments acting as market participants may be difficult to distinguish from those of private actors:

> [T]he economic choices made by public corporations in the conduct of their business affairs, designed as they are to assure maximum benefits for the community constituency, are not inherently more likely to comport with the broader interests of national economic well-being than are those of private corporations acting in furtherance of the interests of the organization and its shareholders.

*City of Lafayette*, 435 U.S. at 403. The Court explained that such local government action can undermine the purposes of the Sherman Act:

> These units may, and do, participate in and affect the economic life of this Nation in a great number and variety of ways. When these bodies act as

owners and providers of services, they are fully capable of aggrandizing other economic units with which they interrelate, with the potential of serious distortion of the rational and efficient allocation of resources, and the efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender.  If municipalities were free to make economic choices counseled solely by their own parochial interests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established.

*Id.* at 408.  The facts of the present case show such dangers.  The Ordinance clearly reflects an anti-competitive purpose, to protect Morgan Hospital from unwelcome competition from St. Francis – Mooresville.  The Ordinance also accomplishes an anti-competitive result that the two hospitals could not accomplish legally on their own.  However, under the controlling Supreme Court reasoning in *Fisher*, St. Francis has not shown that compliance with the Ordinance could be treated as a conspiracy in violation of the Sherman Act.  Because the evidence does not show that the Ordinance constitutes or compels a conspiracy within the meaning of Section 1 of the Sherman Act, St. Francis's claim under the Sherman Act fails.[6]

III.    *Religious Freedom*

       The Religious Land Use and Institutionalized Persons Act bars local governments from imposing land use restrictions that substantially burden religious exercise unless the governments can show the restriction is the least

_____

       [6]St. Francis has not asserted any claim for attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2.

restrictive means for furthering a compelling governmental interest.  42 U.S.C. § 2000cc(a)(1).  St. Francis contends that the Morgan County Ordinance violates RLUIPA because it burdens the religious exercise of providing health care at the St. Francis – Mooresville hospital.  Defendants contend that St. Francis is not entitled to relief under RLUIPA because (a) the claim is not ripe, (b) the Ordinance does not impose a substantial burden on religious exercise, and (c) St. Francis's hospital enterprise is not a religious exercise protected by RLUIPA at all.

A.    *Ripeness*

Morgan County argues that the RLUIPA claim is not ripe because St. Francis has refused to apply for a an exception to the moratorium as provided for in Section 3(g).  Morgan County cites *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005), for the proposition that for a land use claim under RLUIPA to be ripe, a plaintiff must demonstrate a final decision from the state by "submitting at least one meaningful application for a variance."  402 F.3d at 348, citing *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 190 (1985).  Without such evidence of a final decision indicating how a plaintiff may use its property, the Second Circuit explained, a reviewing court cannot know precisely how the contested regulation applies to the plaintiff's land.  *Murphy*, 402 F.3d at 348.  The court also explained that requiring plaintiffs to submit an application for review by the entity implementing the contested land use regulation might better develop a full record for review and provide the parties an avenue for resolution without resort to federal court.  *Id.*

-28-

The court also emphasized that requiring application would serve federalism concerns. *Id.* Applying this policy, the Second Circuit vacated the district court's injunction against enforcement of a cease and desist order where the plaintiff had neither appealed the order nor sought a variance. *Id.* at 345, 352.

The finding of no ripe claim in *Murphy* was based on facts that are not present in this case. Under the procedures applicable in *Murphy*, the Second Circuit found no immediate injury where an application for a variance from the cease and desist order would have automatically stayed its enforcement. *Id.* at 351. In this case, an application to the Commissioners would not have suspended the moratorium as applied to St. Francis. Also, the *Murphy* court found that the failure to apply for a variance left the record significantly undeveloped on important issues, such as whether the enforcement of the order was discriminatory. *Id.* at 351-52. Such analysis may well be sound on the facts in *Murphy*, where the only substantial burden alleged by plaintiffs was the requirement that they cease to hold large prayer gatherings at their home. *Id.* at 345-46. In this case, however, St. Francis has argued and has presented evidence that the exception application procedure itself is ill-defined, vague, and imposes a substantial burden on St. Francis's plans for expansion, including effects on its construction schedule and recruitment of personnel. The *Murphy* court explained that the "*Williamson County* ripeness test is a fact-sensitive inquiry that may, when circumstances warrant, be applicable to various types of land use

challenges." *Id.* at 350. The present circumstances do not warrant application
of the *Williamson County* exhaustion requirement.

The circumstances here are most analogous to the Seventh Circuit's
decision in *Triple G Landfills, Inc. v. Board of Commissioners of Fountain County,*
977 F.2d 287 (7th Cir. 1992), in which the plaintiff challenged a county ordinance
that imposed a moratorium on construction of landfills. Judge Dillin of this court
and the Seventh Circuit both found that plaintiff Triple G's constitutional and
state home rule and zoning claims were ripe even where Triple G had not applied
for a variance from the contested ordinance. Rather than applying the *Williamson
County* exhaustion requirement, the Seventh Circuit applied the traditional
ripeness test by determining (1) "whether the relevant issues [were] sufficiently
focused so as to permit judicial resolution without further factual development";
and (2) "whether the parties would suffer any hardship by the postponement of
judicial action." *Id.* at 289. Applying this two-pronged test, the court found that
Triple G's challenge to a county ordinance restricting the location for landfill
development to five unsuitable areas was ripe even where Triple G had not yet
filed a permit application. *Id.* at 289-90. The court explained that the *Williamson
County* test was designed for regulatory takings claims and emphasized that Triple
G "mount[ed] a facial attack on the ordinance itself, not a challenge to a particular
administrative decision reached thereunder." *Id.* at 289.

As in *Triple G Landfills*, and as distinct from *Murphy*, St. Francis is bringing a facial challenge to the Ordinance itself.  By bringing such a facial challenge, St. Francis faces a tougher burden on the merits, but whether St. Francis's claim is persuasive on the merits is not the point on the ripeness issue.  The claim that forcing St. Francis to go through the exception process would itself impose a substantial burden on its religious exercise is ripe.  The issues in the present case are focused sufficiently to permit judicial resolution without further factual development.

St. Francis has also met its burden in showing sufficient harm posed by the Ordinance to show a ripe case or controversy.  In *Triple G Landfills*, the court emphasized that the practical effect of the ordinance was to preclude any landfill construction anywhere in Fountain County.  The court also found that delay of review of the ordinance was likely to cause a significant harm to Triple G where the prohibited action, developing a landfill, "entail[ed] considerable expense and advance planning, including preparation of the state permit application and arduous work at the proposed site." *Id.*  The same reasoning applies to plans for expansion of a hospital.  As the evidence shows, the St. Francis plan also requires substantial and expensive planning, recruitment, and site preparation, all of which have been stopped or slowed by the Ordinance.  Also, the vagueness of the procedures under the Ordinance imposes some burden on St. Francis's expansion plans anywhere in Morgan County.  Accordingly, St. Francis's facial challenge to the Morgan County Ordinance under RLUIPA is ripe for decision.

B.      *The Merits Under RLUIPA*

RLUIPA prevents a government entity from imposing a land use regulation that substantially burdens the religious exercise of any person, religious assembly, or religious institution unless such a regulation is the least restrictive means of furthering a compelling government interest.  42 U.S.C. § 2000cc(a)(1).[7] As the plaintiff, St. Francis carries the burden of demonstrating that the Ordinance (1) is a land use regulation (2) that substantially burdens (3) St. Francis's religious exercise.  On the merits, St. Francis has failed to establish that the Ordinance imposes a "substantial burden" within the meaning of RLUIPA on either the work at its Mooresville hospital its planned expansion of the facility.

The Seventh Circuit has twice examined what constitutes a "substantial burden" under RLUIPA.  In *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003), the plaintiff churches sought locations throughout the Chicago area.  They claimed that Chicago's zoning scheme substantially burdened their religious exercise.  Affirming the district court's grant of summary judgment in favor of the city, the Seventh Circuit articulated the "substantial burden" test:

---

[7]RLUIPA applies to all substantial burdens imposed:  (1) in a program receiving federal financial assistance; (2) under circumstances in which the burden affects commerce with foreign nations, among the several States, or with Indiana tribes; or (3) as part of a land use regulation system in which the government makes, or is permitted to make, individualized assessments of the proposed uses for the property at issue.  42 U.S.C. § 2000cc(a)(2).

> We therefore hold that, in the context of RLUIPA's broad definition of
> religious exercise, a land-use regulation that imposes a substantial burden
> on religious exercise is one that necessarily bears direct, primary, and
> fundamental responsibility rendering religious exercise – including the use
> of real property for the purpose thereof within the regulated jurisdiction
> generally – effectively impracticable.

*Id.* at 761.  Because the zoning regulations imposed only "ordinary difficulties"
associated with finding a location that were typical to any person, business, or
other entity, the court found no substantial burden.  *Id.*  To find otherwise, the
court explained, would be to interpret RLUIPA as favoring religious institutions by
providing them an "outright exemption from land-use regulations."  *Id.* at 762.

    The Seventh Circuit revisited the substantial burden issue in *Saints
Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d
895 (7th Cir. 2005).  The plaintiff church purchased a tract of land and filed an
application with the defendant city for permission to rezone a piece of the property
from "residential" to "institutional" to allow construction of a new church building.
*Id.* at 898.  In response to the city's concerns that the tract could be developed by
another institutional entity should the church sell the property, the church
modified its application to include a proposal that the parcel be limited to church-
related uses by a "planned unit development ordinance" ("PUD") agreement.  *Id.*
Despite the church's efforts, and in the absence of any proof that a PUD
agreement would dissolve if the land were sold by the church, the defendant city
council rejected the church's modified application.  The city then suggested that
the church engage in additional efforts, which demonstrated that the city, rather

than seeking to raise its valid concerns, was merely "playing a delaying game" to prevent the development.  *Id.* at 899.

The Seventh Circuit found that the city's actions imposed a substantial burden on the church's religious exercise.  The court emphasized that "the Church in [this] case doesn't argue that having to apply for what amounts to a zoning variance to be allowed to build in a residential area is a substantial burden." *Id.* at 900.  Rather, the city had imposed a substantial burden on the church by forcing it either to deal with the city's unexplained and ongoing delay tactics or to look for another parcel, even after the church had resolved the city's supposed concerns.  *Id.*  Such an unjustified burden was sufficient to be "substantial." *Id.*

St. Francis argues that the Ordinance places a substantial burden on the religious exercise of carrying out its healing mission at its Mooresville hospital. For purposes of this analysis, the court assumes without deciding that St. Francis's planned expansion would fall within the "religious exercise" protected by RLUIPA.  The evidence shows, however, that the burden imposed by the mere enactment of the Ordinance is not substantial.  St. Francis has not submitted an application to the Commissioners for a variance.

The only burden presently imposed by the Ordinance would be having to apply for the permit, having to submit potentially confidential business

information to the Commissioners, and facing the possible rejection of its application. Though this uncertainty and additional effort does inconvenience St. Francis, it does not rise to the level of a substantial burden as demonstrated by *Civil Liberties for Urban Believers* and *City of New Berlin*. The evidence shows, after all, that St. Francis has already carried out its own thorough and careful study of the planned expansion, and it has already gathered a great deal of information needed to address the relevant factors under the Ordinance. It is possible, of course, that in actual practice, the Commissioners could apply the Ordinance so as to impose substantial and even onerous burdens. But St. Francis has chosen to bring a facial challenge. The court may not speculate now about how the Ordinance might be applied in the future.

St. Francis argues that its present circumstances are analogous to those in *City of New Berlin*, but this case is readily distinguishable. The plaintiff church in *City of New Berlin* had submitted multiple applications and modified its proposal to address the city's stated concerns. St. Francis has not yet submitted its first application for an exception or for approval from the Commissioners. Most important, the court in *City of New Berlin* found that the city had engaged in deliberate and unjustified delay. St. Francis has not shown such conduct in this case. The burdens on St. Francis are more comparable to those rejected by the court in *Civil Liberties for Urban Believers*, the ordinary inconveniences and challenges of submitting a permit application that are faced by any non-religious entity.

Interpretation of the substantial burden provision to prohibit every regulation limiting any use of property for religious purposes would render the word "substantial" meaningless.  See *Civil Liberties of Urban Believers*, 342 F.3d at 761.  Also, St. Francis's argument would effectively exempt any religious-based health care facility from otherwise valid certificate of need laws, which would seem to be a sweeping and unwarranted exemption.  RLUIPA does not grant churches a blanket exemption from zoning laws, after all.  *Id.* at 762.  St. Francis has not proved its facial challenge to the Ordinance under RLUIPA.  The court does not reach the question whether the Ordinance is a land use regulation or whether St. Francis's expansion amounts to a "religious exercise" under RLUIPA.

IV.   *Claims Under Indiana Law*

This court has supplemental jurisdiction over St. Francis's Indiana law claims under 28 U.S.C. § 1367(a).  The disposition of St. Francis's federal claims, even after trial, gives the court discretion either to retain or relinquish jurisdiction over the supplemental claims.  28 U.S.C. § 1367(c)(3).  Defendants argue that the court should relinquish jurisdiction because St. Francis's remaining claims raise "novel or complex issues of state law."  See 28 U.S.C. § 1367(c)(1).  However, as shown below, the state law issues presented by St. Francis's Home Rule Act claim, at least, are sufficiently well-defined to warrant this court's exercise of supplemental jurisdiction.

The Supreme Court has taught that "when deciding to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 173 (1997), quoting *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988).  Federal jurisdiction over supplemental state law claims is particularly appropriate in situations where the federal judicial investment in the supplemental claim is substantial.  *Wright v. Associated Insurance Cos.*, 29 F.3d 1244, 1252 (7th Cir. 1994), citing *Graf v. Elgin, Joliet and Eastern Ry. Co.*, 790 F.2d 1341, 1347-48 (7th Cir. 1986) ("Judicial economy, the essential policy behind the modern doctrine of pendent jurisdiction which *Gibbs* created, supports the retention of pendent jurisdiction in any case where substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort.").

Although this case has not been pending long, this court has devoted substantial resources to it by taking it to trial promptly.   Relinquishing jurisdiction so that the parties could start over in the state courts would not serve the purposes of judicial economy, convenience, fairness, or comity.  In addition, there is a substantial public interest in the prompt resolution of this case to address health care needs in Morgan County.  In light of these considerations, and the clarity of at least the home rule issue, this is an appropriate case to retain jurisdiction over the state law claims.  See *Miller Aviation v. Milwaukee County*

*Board of Supervisors*, 273 F.3d 722, 731-32 (7th Cir. 2001) (finding district court abused discretion by relinquishing jurisdiction over state law claims after investing substantial resources over several years to decide and dismiss the federal claims, and remanding to district court to consider state law claims in first instance); *Triple G Landfills, Inc. v. Board of Commissioners of Fountain County*, 977 F.2d 287, 291-92 (7th Cir. 1990) (affirming district court's exercise of jurisdiction over pendent state law zoning claim without reaching Home Rule Act claim or federal constitutional claims); *Pro-Eco, Inc. v. Board of Commissioners of Jay County*, 956 F.2d 635, 638-39 (7th Cir. 1992) (affirming district court's exercise of jurisdiction over pendent state law zoning claim requiring interpretation of Home Rule Act without reaching federal claim).

A.   *Indiana Home Rule Act*

St. Francis has shown that the Morgan County Ordinance exceeds the limits on local government powers provided by Indiana's Home Rule Act, Ind. Code §§ 36-1-3-1 to -9.  The Ordinance attempts to regulate conduct over which the Board of Commissioners and the county have no authority.  Enacted by the state legislature in 1980, the Home Rule Act abrogated the traditional rule that local government powers were limited to only those expressly granted by state statute. *City of Gary v. Indiana Bell Telephone, Co.*, 732 N.E.2d 149, 153 (Ind. 2000).  The statute grants local government units "all powers that they need for effective operation of government as to local affairs."  Ind. Code § 36-1-3-2.  Toward this

-38-

end, "Any doubt as to the existence of a power of a unit shall be resolved in favor of its existence."  Ind. Code § 36-1-3-3(b).

The Home Rule Act's broad grant of authority nevertheless imposes important limits.  Counties may not exercise powers that are expressly denied by a state statute or that are expressly granted to another entity.  Ind. Code § 36-1-3-5(a)(1) & (2).  Most relevant here, the preemption provision of the Home Rule Act specifically withholds from counties the power to "regulate any conduct that is regulated by a state agency, except that which is expressly granted by statute."  Ind. Code § 36-1-3-8(a)(7).  The Article governing the Home Rule Act defines the term "regulate" to include licensing, inspecting, or prohibiting.  Ind. Code § 36-1-2-15.  Thus, despite a generally permissive state policy in favor of local authority, Indiana law specifically provides that a local government seeking to regulate conduct licensed, inspected, or prohibited by the state may do so only where expressly allowed by statute.  Ind. Code § 36-1-3-8(a)(7).

For present purposes, the most relevant application of the home rule preemption provision was in *Triple G Landfills, Inc. v. Board of Commissioners of Fountain County*, 774 F. Supp. 528 (S.D. Ind 1991).  In *Triple G Landfills*, the district court granted summary judgment in favor of the plaintiff finding that a similar ordinance was invalid where it exceeded any possible grant of authority to the county, either express or implied.  Plaintiff Triple G, a landfill operator, purchased an option to buy nearly two hundred acres of land in Fountain County

-39-

and, planning to develop a landfill on the property, invested in analyses and evaluations of the land. *Id.* at 529. In response to community concern sparked by Triple G's plans, the county passed an ordinance imposing a moratorium on landfill development. The ordinance also established a county-level permit application process that required prospective landfill operators to gain approval for landfill development from the county after completing the application process at the state level, and provided standards for site location of landfills. *Id.* at 529-30. The standards prevented landfill development in all but five smaller parcels of land, rendering such development economically infeasible for Triple G anywhere in the county. *Id.* at 530.

Plaintiff Triple G argued that the moratorium ordinance was preempted by the Home Rule Act because landfills were already regulated by Indiana Department of Environmental Management ("IDEM"), and because the county had not been given express authority to add additional regulations. Fountain County argued that it had been granted express authority to govern landfill development in the following statute:

> [IDEM] shall encourage and assist local units of government in developing programs and facilities for air, water, radiation, odor, and noise pollution control, wastewater treatment, water resource development, and solid waste management.

*Id.* at 531. Judge Dillin found no such authority to regulate landfills for two reasons relevant to this case. First, though such authority may have been "tacit," the provision did not "expressly" provide such authority, as required to escape

preemption where the conduct was already subject to state regulation.  Second, the court also found no authority because the provision gave "no indication . . . that the 'programs and facilities' to which [the provision] refers encompass the detailed regulation of landfill siting, design, and operation that the Fountain County Ordinance provides."  *Id.* at 532.[8]

Indiana law unambiguously and explicitly grants the Indiana State Department of Health ("ISDH") the right to "license and regulate" hospitals.  Ind. Code § 16-21-2-2(1).  No person, county, or other enumerated entity may establish, maintain, or operate a hospital without first obtaining a license to do so from the state health commissioner.  Ind. Code § 16-21-2-10.  An applicant for such a license must submit information regarding the applicant's character, its ability to comply with the minimum standards for hospital operations, the location and type of institution to be operated, and the range of services to be offered, among other kinds of information.  *Id.* § 11.  The state health commissioner may discipline a hospital by, among other sanctions, issuing a probationary license, denying license renewal, or revoking a license.  Ind. Code § 16-21-3-1.

A 2005 Indiana law applies additional requirements to hospital construction projects, including the erection, installation, alteration, repair, or remodeling of a building that will be subject to licensure as a hospital.  Ind. Code § 16-21-2-

---

[8]The Seventh Circuit affirmed Judge Dillin's decision on zoning grounds, without reaching the home rule issue.  977 F.2d 287, 291 (7th Cir. 1990).

11.5(a).  Before the owner of a hospital may begin a construction project, the owner must hold at least two public hearings regarding the project, announcing such information such as a description of the project, its estimated cost, and the owner's reason for the project.  Ind. Code § 16-21-2-11.5(d) & (f).

In accord with the statute giving the ISDH the responsibility for licensing hospitals, the licensure regulations govern a wide range of hospital operations, including a hospital's physical environment and plant maintenance.  410 Ind. Admin. Code § 15-1.2-1(a)(10) & (11).  The regulations require that hospitals "shall be constructed, arranged, and maintained to ensure the safety of the patient and to provide facilities for services authorized under the hospital license" as provided. 410 Ind. Admin. Code § 15-1.5-8.  Further, any replacement of or addition to the physical plant of a hospital must meet the same requirements as those required for construction of a new hospital.  410 Ind. Admin. Code § 15-1.3-1(f).  The regulations also provide that all new hospital construction projects or additions meet the "Guideline for Construction and Equipment of Hospital and Medical Facilities," as well as meeting additional requirements pertaining to the location, sanitation, fire safety, accessibility, and other aspects of construction and maintenance.  410 Ind. Admin. Code § 15-1.5-8(c).

Accordingly, St. Francis has shown that the state agency regulates the same conduct that the Morgan County Ordinance attempts to regulate: the construction of new and expanded hospital facilities.  Under the Indiana Home Rule Act, the

-42-

issue then becomes whether Morgan County has been "expressly granted by statute" the authority to regulate that same conduct.  Ind. Code § 36-1-3-8(a)(7).

Defendants contend that Morgan County has been expressly granted the right to enact the Ordinance under the state statute discussed earlier, which authorizes county governments to establish and to "aid" county hospitals:

> A [county] may provide medical care or other health and community services to persons and may impose restrictions upon persons or animals that might cause other persons or animals to be injured or contract diseases.  A [county] may also establish, aid, maintain, and operate hospitals.

Ind. Code § 36-8-2-5.  Defendants argue that the language permitting the county to "aid" Morgan Hospital amounts to express authority to enact the Ordinance requiring county permission before competing health care facilities are constructed.

The grant of authority to "aid" Morgan Hospital fails to provide the kind of express authority required under the relevant case law.  As in *Triple G Landfills*, where the court found that the county did not gain authority from a charge to the state to "assist" counties in waste management, the authority to "aid" a county hospital is not an express grant of authority that warrants an additional and substantial permit process for conduct already subject to extensive regulation by the state.  As in *Triple G Landfills*, the state statute provides no indication that it encompasses either the scheme or the aims of the Ordinance.  The mere authority

to aid the county hospital does not support an inference that the General Assembly has given the county the power to hinder the county hospital's competition by prohibiting its expansion.

The statute discussed above in connection with the state action doctrine under antitrust law is also important here.  The Indiana General Assembly has given the ISDH the responsibility to engage in health planning activities that "foster competition" and "encourage innovations in the financing and delivery systems for health services" in Indiana.  Ind. Code § 16-30-1-1.  Further, the ISDH is required to submit an annual report to the Governor and General Assembly detailing, on a county-by-county basis, the health needs of Indiana and any recommendations related to such needs.  Ind. Code § 16-30-2-1.  In completing the report, the ISDH must consider the kinds of concerns that arise in the present case, such as the capacity of existing market conditions to improve quality assurance in the provision of health care services.  Ind. Code § 16-30-2-2(4).  Perhaps most important, Indiana law requires the ISDH to consider in its assessment "the competitive factors of the free enterprise system, with the goal of encouraging competition and efficiency in the utilization of health resources."  Ind. Code § 16-30-2-2(6).

Defendants' argument that the county's authority to "aid" a county hospital includes the power to enact ordinances that purposely block a principal competitor cannot be reconciled with this express state policy favoring competition

among hospitals.  In light of that state policy, defendants' strained interpretation of the term "aid" cannot reasonably be extended to allow a local government to undermine the state policy by imposing its own moratorium or certificate of need requirement.   Indiana Code Section 36-8-2-5 did not grant Morgan County authority to enact the Ordinance at issue, and defendants have not identified any other state statute that authorizes the Ordinance.

Case law also clearly supports the conclusion that the Ordinance is beyond the scope of Morgan County's home rule powers.  In support of their position, defendants cite *Hobble v. Basham*, 575 N.E.2d 693 (Ind. App. 1991).  In *Hobble*, the defendant sought a declaration that a local ordinance regulating the safety features of ice cream trucks was invalid under the Home Rule Act preemption provision.  Reversing a circuit court finding that the ordinance was invalid, the appellate court found that the ice cream truck regulations were authorized by a state statute expressly permitting local authorities to adopt additional traffic regulations within their jurisdiction.  *Id.* at 697, quoting Ind. Code § 9-4-1-27(a) (repealed 1991) ("Local authorities may, however, adopt by ordinance additional traffic regulations with respect to streets and highways under their jurisdiction, so long as they do not conflict with or duplicate the provisions of a statute.").  The court of appeals held that local governments may "impose additional reasonable regulations" or otherwise supplement state law "provided the additional burdens are logically consistent with the statutory purpose." *Id.* (emphasis omitted).

Morgan County also relies upon *Lex, Inc. v. Board of Trustees of Town of Paragon*, 808 N.E.2d 104 (Ind. App. 2004).  In *Lex*, the plaintiff challenged a town ordinance prohibiting the use for occupancy of any mobile homes five years old or older.  Because the regulation and licensing of mobile home parks was within the exclusive control of the state, the plaintiff argued, the town's ordinance was preempted.  The Indiana Court of Appeals rejected this argument, explaining that the county was merely "enforcing the [State] Health Department's sanitary and safety regulations," and "not seeking to exceed its authority."  *Id.* at 110.

Morgan County's Ordinance in this case does not meet the standards of these Indiana decisions. The Ordinance serves a purpose of restricting competition, a purpose that is not merely different from the state regulations and policy, but is flatly *contrary* to the express state policy of promoting competition. The Ordinance is not "logically consistent" with the state's statutory purpose, as it would need to be to pass muster under the *Hobble* standard.  Also, the ordinance in *Hobble* was based on a much clearer grant of statutory authority than the county's power to "aid" a county hospital in this case.  The contested ordinance in *Lex*, which regulated the age of occupied mobile homes, did not specifically regulate the same conduct regulated by the state, which pertained to the operation of mobile home parks.  *Id.*  The court in *Lex* also emphasized that the mobile home ordinance served the same purpose as the state's regulations, safety and sanitation.  The Morgan County Ordinance, by contrast, does not serve any articulated purpose of the state, but runs counter to state policy.

Because the Morgan County purports to regulate the construction and expansion of hospitals, conduct that is already highly regulated by the state of Indiana, and because such local regulations are not expressly authorized by state statute, the Ordinance is preempted by Indiana's Home Rule Act, at least as applied to hospital construction and expansion.  Ind. Code § 36-1-3-8(7).[9]

> B.    *Zoning Law*

St.  Francis challenges the Morgan County Ordinance in two ways under Indiana zoning laws.  First, St. Francis argues that the Ordinance is invalid because it amounts to a zoning ordinance that was not enacted in compliance with the procedural requirements for zoning ordinances.  Second, St. Francis argues that because the town of Mooresville has exclusive authority to zone the geographic area of St. Francis's proposed expansion, Morgan County lacks the authority to zone the affected property.  The court rejects both challenges because the Ordinance is not a zoning law under Indiana law.

The parties stipulated that "the Morgan County Plan Commission did not certify the Ordinance pursuant to Ind. Code § 36-7-4-604  & -605," which provide for the procedures necessary for local governments to enact zoning ordinances. Jt. Stip. Fact ¶ 34.  Also, Morgan County does not have authority to make zoning

---

[9]In light of the Ordinance's severability clause, the court expresses no opinion on whether the Ordinance might be applied to other types of covered health care facilities.

decisions within the limits of the town of Mooresville, where St. Francis – Mooresville hospital is located.

The decisive issue for both of St. Francis's zoning theories is the threshold question whether the Ordinance should be considered a zoning ordinance at all. St. Francis argues that the Ordinance is a zoning ordinance because it restricts the use of its property and all other properties within the county.  Defendants argue that the Ordinance is not a zoning law because it is merely a form of economic regulation that is not intended to serve the purposes of zoning laws.

St. Francis relies on decisions holding that county-wide moratoria on establishing landfills and a city ordinance imposing a moratorium on off-track wagering parlors were invalid because they amounted to zoning laws that had not complied with state law's procedural and/or substantive requirements.  See *Sagamore Park v. City of Indianapolis*, 885 F. Supp. 1146, 1150 (S.D. Ind. 1994) (holding invalid a zoning ordinance creating a 90-day moratorium on the development of satellite wagering facilities); *Triple G Landfills, Inc. v. Board of Commissioners of Fountain County*, 977 F.2d 287, 291-92 (7th Cir. 1992) (declaring invalid a zoning ordinance imposing restrictions on the development of landfills); *Pro-Eco, Inc. v. Board of Commissioners of Jay County*, 956 F.2d 635, 638 (7th Cir. 1992) (finding invalid a sanitary landfill moratorium under Indiana zoning law).

The clearest guidance on this issue comes from the Seventh Circuit's decision in *Pro-Eco*:

> Under Indiana law, a zoning ordinance is "an ordinance adopted under the 600 series of I.C. 36-7-4 or under prior law."  Ind. Code Ann. § 36-7-1-22 (West Supp. 1991).  The Board argues that the ordinance is not a zoning ordinance because it does not regulate the use of any particular piece of property.  Stated another way, the Board claims that the terms "zoning" and "regulating" have different meanings under Indiana law.  The Board claims that, as applied to local governments, the term "regulate" includes "license, inspect, or prohibit."  Ind. Code Ann. § 36-1-2-15 (West 1983).  The Board claims that "'zoning' is the separation of a municipality into districts or 'zones' and the regulation of each district as to the structure, nature and use of buildings and land."  5 P. Rohan, *Zoning and Land Use Controls* § 37.01[1].   The Board therefore claims that the ordinance cannot be a zoning ordinance because it does not divide the county into various zones.

> We do not disagree with the various definitions of zoning cited by the Board. We conclude, however, that the Board's version of the definition of zoning is inconsistent with Indiana's statutory framework for zoning because it is far too narrow to do justice to the plain meaning of Indiana's zoning statutes. Another authority defines zoning as:

> > * * * the regulation by districts of the building development and uses of property, and its essence is a territorial division according to the character of land and structures and their peculiar suitability for particular uses and the uniformity of use within the division. The essential object of zoning regulations is to stabilize property uses and preserve the character of neighborhoods, and they may be intended to guide the future development of uses of land in certain areas and to protect such areas during transition periods in connection with anticipated future development.

30 I.L.E., *Zoning*, § 1, p. 635 (1960).

> In *Misner v. Presdorf*, 421 N.E.2d 684, 686 (Ind. Ct. App.1981), the court noted that "the ultimate purpose of zoning regulations is to confine certain classes of uses and structures to certain areas."  Under a proper definition of zoning, such as the I.L.E. definition, a regulation, enacted after the preparation of a master plan pursuant to Ind. Code Ann. § 36-7-4-601(a) (West Supp. 1991), which banned the construction of any landfills, or airports, or manufacturing plants in an entire county would

-49-

certainly be a zoning ordinance.  Thus, we cannot agree with the Board that a zoning ordinance must divide a county into districts.

The ordinance enacted by the Board is consistent with the definition of zoning in several other ways.  First, in § 1, it attempts to permit nonconforming uses.  *See Misner*, 421 N.E.2d at 686. The ordinance also stabilizes property uses in Jay County by preventing the creation of new sanitary landfills, and "preserves the character of existing neighborhoods." 30 I.L.E., *Zoning*, § 1.  It also protects the entire county "during transition periods in connection with anticipated future development."  *Id.*  The Board itself admits that the ordinance is an "emergency, interim measure" designed to "preserve the status quo."

If we were to accept the Board's position it would allow the Board to frustrate the Indiana statutory framework for orderly zoning by enacting a temporary and unspecific moratorium whenever the Board perceived that an individual planned an undesirable use.  Thus, the district court correctly concluded that the ordinance enacted by the Board was a zoning ordinance.

956 F.2d at 638.

St. Francis focuses on the statement in this passage quoted from the Indiana Law Encyclopedia that a regulation that banned construction of a certain category of use in the entire county would be a zoning ordinance.  The argument overlooks the qualification that the regulation would need to be enacted after preparation of a master plan.  The Seventh Circuit quoted that statement to address Jay County's argument that a law would be a zoning ordinance only if it divided the county into different zones.  The quoted statement cannot be read so broadly as to require that any county-wide economic regulation must be adopted pursuant to the zoning laws, let alone to support the logical consequence, that a county government would be unable to impose such regulations in the entire county, including municipalities that exercise their own zoning authority.

Considering the Morgan County Ordinance as a whole, it clearly is not a zoning law. It is a form of economic regulation. It is not intended to serve the purposes of a zoning law, such as stabilizing property uses or preserving the character of neighborhoods, as the landfill and off-track betting moratoria were. See *Pro-Eco*, 956 F.2d at 638; *Sagamore Park*, 885 F. Supp. at 1150. Instead, its clear intention is to protect Morgan Hospital from competition anywhere in the county, regardless of the particular location of the competing facilities. This is clearest when one examines the factors in Section 7(g), which govern the Board of Commissioners' decisions on applications for exceptions in 2005 and afterward under the certificate of need process. Those factors simply do not address zoning goals like stabilizing property uses or preserving the character of neighborhoods. They address instead economic effects on existing health care facilities and the overall levels and availability of health care services to county residents.

Under Indiana law, counties have police powers that allow them to legislate to promote the general public welfare. There is no reason that power cannot include in some instances the power to prohibit or to restrict the operation of certain businesses in the entire county. Such a regulation might have an incidental effect on use of particular parcels, but under the reasoning of *Pro-Eco*, such an exercise of the police power does not automatically become a zoning ordinance by reason of such effects. Otherwise, for example, Morgan County would be unable to apply its police power regulations within the Mooresville town

limits or within the limits of any other municipality that had its own zoning authority.

As the court has explained above, of course, the state's licensing of hospitals and its policy to promote competition undermine Morgan County's authority to enact this particular Ordinance, but in the absence of those provisions of state law, the state's zoning laws would not prohibit this form of economic regulation.

*Conclusion*

Based on the foregoing, the court finds that the Indiana Home Rule Act preempts application of the Morgan County Ordinance to hospital construction and expansion.  Accordingly, St. Francis is entitled to a permanent injunction against enforcement of the Ordinance as applied to its plans to expand its hospital in Mooresville.  The Ordinance is not preempted by the Sherman Act, does not violate St. Francis's rights under RLUIPA, and does not violate Indiana zoning laws.  A final judgment shall issue.

So ordered.

Date:  November 2, 2005

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

-52-

Copies to:

Thomas A. Barnard
SOMMER BARNARD ATTORNEYS, PC
tbarnard@sommerbarnard.com

Dave C. Bromund
SOMMER BARNARD ATTORNEYS, PC
dbromund@sommerbarnard.com

Michael D. Chambers
SOMMER BARNARD ATTORNEYS, PC
mchambers@sommerbarnard.com

Joseph C. Chapelle
BARNES & THORNBURG LLP
joe.chapelle@btlaw.com

Mark Jason Crandley
BARNES & THORNBURG LLP
mcrandley@btlaw.com

John J. Miles
OBER, KALER, GRIMES, & SHRIVER
jjmiles@ober.com

Kendall H. Millard
BARNES & THORNBURG LLP
kmillard@btlaw.com

Gail Reindl
SOMMER BARNARD ATTORNEYS, PC
greindl@sommerbarnard.com

Steven C. Shockley
SOMMER BARNARD ATTORNEYS, PC
sshockley@sommerbarnard.com

Edward John Steeren
OBER, KALER, GRIMES & SHRIVER
ejsteren@ober.com